Affirmed by unpublished opinion.
Judge AGEE wrote the majority opinion, in which Judge KEENAN joined. Judge GREGORY wrote an opinion dissenting in part.
Unpublished opinions are not binding precedent in this circuit.
AGEE, Circuit Judge:
Jeffrey Greenfield collaborated with Erwin-Penland, a South Carolina advertising agency, on a marketing plan aimed at securing a contract with the Captain D’s restaurant chain. Captain D’s declined to implement the proposal, which centered on the general concept of a gospel choir competition entitled “How Sweet the Sound.” Erwin-Penland, however, later convinced another client, Verizon Wireless, to fund a modified version of the project, but without the participation of Greenfield or his company, 1st Approach LLC (collectively “Greenfield”). Greenfield subsequently demanded compensation from Erwin-Pen-land, who responded by filing a declaratory judgment action in South Carolina state court, seeking a ruling that Greenfield had no ownership interest in the “How Sweet the Sound” concept.
Greenfield removed the case to the United States District Court for the District of South Carolina and instituted various counterclaims, including a third-party complaint against Verizon Wireless and Joseph Erwin — the president of Erwin-Penland. The district court concluded that Greenfield had no protected interest in the “How Sweet the Sound” project and granted summary judgment in favor of Erwin-Pen-land and the third-party defendants.[1] Greenfield now challenges that ruling on appeal. For the reasons stated herein, we affirm the judgment of the district court.
I.
Joseph Erwin heard Greenfield speak on the subject of “branded entertainment” at a conference. Subsequently, he asked Greenfield to collaborate with Erwin-Pen-land on a marketing proposal aimed at securing an account with the Captain D’s restaurant chain. Greenfield accepted Erwin’s offer without entering into a written agreement establishing the terms of his relationship with Erwin-Penland.
After a series of collaborative phone calls and emails, Greenfield sent ErwinPenland a marketing deck outlining a con *210 cept he labeled “ ‘Amazing Grace’ Captain D’s Branded Reality Show.” Joint Appendix (“J.A.”) at 1375. Erwin-Penland subsequently changed the name of the proposal to “How Sweet the Sound.” Id. at 712, 896. The “How Sweet the Sound” concept involved “[t]he top 20 church choirs in the U.S. competing for over $250,000 in prizes and the title of the Best Choir in the USA.” Id. at 1376. A production team of producers and cameramen, along with a host “[similar to Ryan Seacrest on American Idol,” would “cross the country in [a] 6 week trek of visiting EVERY Captain D’s location,” using local media to publicize the event. Id. at 1377. Once there, the team would interview local choir members about their “choir and why they think they are the best in the US.” Id.
Competitions would then take place in Atlanta, Georgia; Jackson, Mississippi; Birmingham, Alabama; and Charleston, South Carolina between the best twenty-five choirs in each region. Each contest would be featured in a television episode, take place “in large arenas,” and “have a large panel of celebrity judges who [would] vote on the best overall performance.” Id. The winners of the regional competitions would then “be invited to attend [a] National competition in Nashville,” Tennessee featuring “the 4 best church choirs in the country in an authentic inspirational contest to find the # 1 Choir in the USA.” Id. Winning the national competition would entitle a choir to “the title of the Best Choir in the USA” and “over $250,000 in prizes.” Id. at 1376.
In conjunction with the “entertainment” provided by the gospel choir competition, Greenfield proposed marketing Captain D’s through three different mediums: product placement, radio, and the internet. The parties intended that Greenfield would serve as producer and talent broker for Captain D’s “How Sweet the Sound” project. Although Captain D’s expressed some interest in the proposal, it ultimately declined to adopt the plan.
Subsequently, Greenfield and ErwinPenland presented a similar “How Sweet the Sound” concept to Verizon Wireless, one of Erwin-Penland’s existing clients. Modifications were made to this proposal to better suit Verizon Wireless’ business model. For example, Greenfield and Erwin-Penland suggested signing choirs up for the competition at Verizon Wireless stores and creating “a CD of the winning choirs” that would be distributed “through stores and agents.” Id. at 1587.
Although Verizon Wireless also expressed interest in the “How Sweet the Sound” concept, it had concerns about the plan’s projected cost. Greenfield and Erwin-Penland subsequently worked to scale back the television component of the project to a one-hour special or documentary. When Verizon Wireless’ response to this less-expensive model was not immediately forthcoming, Greenfield inquired as to whether Verizon Wireless was still interested in the concept or whether he was free to present it to other clients. ErwinPenland responded that Verizon was still considering the scaled-back plan.
Over a year later, Erwin-Penland and Verizon Wireless implemented a limited “How Sweet the Sound” marketing concept by organizing a single gospel choir competition in Memphis, Tennessee. The project later evolved into a series of gospel choir competitions orchestrated throughout the nation. In 2009, the final contest was televised on the Gospel Music Channel and a documentary about the series appeared on the Black Entertainment Television Network (“BET”). Although other agencies aided Erwin-Penland and Verizon Wireless in implementing the “How Sweet the Sound” concept, Greenfield was *211 not asked to assist, and had no part, in executing the plan.
II.
Greenfield demanded compensation from Erwin-Penland for its use of the “How Sweet the Sound” marketing plan, which he claimed to have originated. In response, Erwin-Penland filed a declaratory judgment suit in South Carolina state court, requesting a ruling that Greenfield had “no co-ownership interest or rights in the marketing project ‘How Sweet the Sound.’ ” J.A. at 28. Greenfield removed the case to the United States District Court for the District of South Carolina based on the parties’ diverse citizenship. See 28 U.S.C. § 1382(a). He then filed a first amended counterclaim and third-party complaint against Erwin-Penland and the third-party defendants, which stated numerous claims for, inter alia, fraud, breach of contract, misappropriation of trade secrets, and unjust enrichment.
Erwin-Penland and the third-party defendants subsequently filed motions for summary judgment as to all of Greenfield’s claims. In turn, Greenfield filed a motion for summary judgment on his unjust enrichment and breach of fiduciary duty claims. The district court concluded that no genuine issue of material fact precluded granting judgment as a matter of law to Erwin-Penland and the third-party defendants. Accordingly, the court granted summary judgment in their favor on all claims and denied Greenfield’s competing motion for summary judgment.
First, the district court concluded that “Greenfield’s purported trade secrets fail[ed] to meet [the] criterion” for protection under the South Carolina Trade Secrets Act (“the Act”), see S.C.Code Ann. § 39-8-20(5), because his “claimed trade secrets [were] not novel or protectable, and, if they were, Greenfield failed to take reasonable steps to protect them.”[2] J.A. at 183. Thus, “even assuming the existence of ... trade secret[s],” id. at 183 n. 3, summary judgment was appropriate “for the independent reason that Greenfield failed to take reasonable efforts to protect” them. Id. at 187.
Second, the district court rejected Greenfield’s argument that he had “an oral or implied-in-fact contract” with ErwinPenland that was subject to breach. Id. at 189. Because “[t]he parties did not discuss, let alone come to an agreement on, the essential terms of a contract,” the district court concluded “no reasonable trier of fact could find mutual assent as to any essential terms” of an agreement, given “either orally, in writing, or implied” in fact. Id. at 189.
Indeed, the district court concluded that “[a] careful review of the documentary record and deposition testimony” established, “at best, that Erwin-Penland and Greenfield ... discuss[ed] potential or speculative options for the [“How Sweet the Sound”] concept[].” Id. It was “undisputed that no proposed options made by Greenfield were ever accepted by ErwinPenland.” Id. at 189-90. The district court consequently determined that Greenfield was unable to “point to any objective manifestations and expressions by ErwinPenland that would be sufficient to establish the existence of a contract.” Id. at 190; see also id. (“Mere expectations and one-sided hopes of a party do not make a contract....”).
Third, the district court held that Greenfield “failed to satisfy the elements necessary to support” an unjust enrichment *212 claim. Id. at 199. Greenfield’s “only contribution to” the “How Sweet the Sound” project “was in conjunction with ... speculative pitches ... to Verizon Wireless and Captain D’s.” Id. at 200. As he had no “role in executing and implementing the ... project ... eventually undertaken by Verizon Wireless” and “did not contribute any trade secret or other protectable information” to the marketing scheme, the district court held that Greenfield was unable to “prove as a matter of law that a non-gratuitous ‘benefit’ was conferred for which compensation [was] required.” Id.
Fourth, the district court ruled that Greenfield’s attempt to cancel Erwin-Pen-land’s “How Sweet the Sound” trademark based on fraudulent representations to the United States Patent and Trademark Office failed as a matter of law. The court stated that even if Greenfield’s factual allegations were true, “[t]rademark rights are not based on creativity, but on use in commerce.” Id. at 201. Because it was “undisputed that Greenfield ha[d] not used the [“How Sweet the Sound”] mark in commerce,” he could not “claim trademark rights in the term” or demonstrate “that Erwin-Penland committed fraud in procuring th[e] trademark registration.” Id.
Greenfield noted a timely appeal of the district court’s order granting summary judgment. We have jurisdiction under 28 U.S.C. § 1291.
III.
On appeal, Greenfield generally argues the district court misapplied the summary judgment standard in failing to view the record evidence and all inferences drawn therefrom in the light most favorable to him, as the non-moving party. He more specifically avers the district court erred in concluding the “How Sweet the Sound” concept failed to meet the criteria for protection under the Act. For example, Greenfield contends the district court applied “a non-existent novelty requirement” for trade secret protection and ignored a genuine issue of material fact as to whether he took reasonable efforts to preserve the secrecy of the “How Sweet the Sound” marketing scheme. Opening Br. at 23.
Greenfield also challenges the district court’s “failure to discern in the” relationship between himself and Erwin-Penland “the basis for imposing contractual and equitable duties” predicated on ErwinPenland’s and Verizon Wireless’ “unjust enrichment at [his] expense.” Id. at 24. Finally, Greenfield claims the district court erred in refusing to cancel Erwin-Pen-land’s “How Sweet the Sound” trademark based on various fraudulent assertions made throughout the trademark registration process.[3] See id.; see also 15 U.S.C. § 1064(3).
In response, Erwin-Penland and the third-party defendants argue the Act offers no protection as to any of Greenfield’s claims concerning the “How Sweet the Sound” marketing scheme. They contend the concept was “ ‘readily ascertainable by proper means by the public,’ ” Response Br. at 19, and that Greenfield “knowingly shared [the plan] with multiple third parties (some of whom were Greenfield’s competitors)” without the protection offered by a confidentiality agreement. Id. at 20. Accordingly, Erwin Penland and the third-party defendants maintain that “Greenfield cannot prove ... he took reasonable efforts to maintain the confidentiality of his supposed secrets.” Id.
*213 Based on Greenfield’s admissions that the parties “engaged only in preliminary proposals in advance of a speculative pitch for new business and never even discussed the essential terms of a ... contract,” Erwin-Penland and Verizon Wireless also dispute Greenfield’s claim that a binding contractual relationship was established. Id. at 20-21. They further argue that Greenfield is unable to make out a claim for unjust enrichment, as he contributed neither labor nor a protected piece of intellectual property to the marketing scheme Verizon Wireless eventually implemented. Lastly, Erwin-Penland and the third-party defendants would have us reject Greenfield’s trademark-cancellation claim because “he makes no claim to ever having used the [“How Sweet the Sound”] mark in commerce.” Id. at 34.
IV.
“We review de novo a district court’s award of summary judgment, viewing the facts and inferences reasonably drawn therefrom in the light most favorable to the nonmoving party.” Fraternal Order of Police Lodge No. 89 v. Prince George’s County, 608 F.3d 183, 188 (4th Cir.2010). Under Federal Rule of Civil Procedure 56(a), summary judgment is appropriate “if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.” In this case, the record demonstrates that no genuine dispute as to a material fact precluded granting judgment as a matter of law in favor of ErwinPenland and the third-party defendants. See Estate of Kimmell v. Seven Up Bottling Co. of Elkton, Inc., 993 F.2d 410, 412 (4th Cir.1993) (“[I]n a case where ‘the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial’ and summary judgment is proper.” (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986))).
A. Trade Secret
The South Carolina Trade Secrets Act protects “trade secrets” that meet two separate criteria.[4] First, the trade secret must “derive[ ] independent economic value, actual or potential, from not being generally known to, and not being readily ascertainably by proper means by the public or any other person who can obtain economic value from its disclosure or use.” S.C.Code Ann. § 39-8-20(5)(a)(i). Second, the trade secret must be “the subject of efforts that are reasonable under the circumstances to maintain its secrecy.” Id. § 39 — 8—20(5) (a) (ii). As the plain language of the statute provides, information must satisfy both criteria in order to be deemed a “trade secret” under the Act.[5] Id. § 39-8-20(5)(a).
*214 For purposes of this opinion, we assume, without deciding, that the “How Sweet the Sound” concept satisfies the Act’s first criterion.[6] A reasonable finder of fact, however, could not conclude that Greenfield took reasonable efforts to maintain the secrecy of the “How Sweet the Sound” marketing scheme, the second criterion for protection under the Act. In Lowndes Products, Inc. v. Brower, 259 S.C. 322, 191 5.E.2d 761 (1972), the Supreme Court of South Carolina construed the reasonable-efforts-to-maintain-secrecy requirement as setting a high bar for trade secret protection.[7] See id. at 766; see also Woven Elecs. Corp. v. Advance Grp., Inc., 930 F.2d 913, Nos. 89-1580 & 89-1588, 1991 WL 54118, at *3 (4th Cir. Apr.15, 1991), as amended May 6, 1991 (unpublished) (characterizing “a consistent effort ... to keep” a “wire weaving process” secret, rather than “isolated attempts to protect [that information’s] confidentiality,” as sufficient to meet the reasonable-efforts-to-maintain-secrecy requirement) (citing Lowndes Prods., 191 S.E.2d at 765).
Individuals “entitled to a trade secret” and desiring “to have its exclusive use in [their] own business” are barred, from “lightly or voluntarily hazard[ing] its leakage or escape.” Lowndes Prods., 191 S.E.2d at 766 (quotation omitted). Revealing a trade secret to others is consequently fatal to its protected status unless one “exercise[s] eternal vigilance.”[8] Id. (quotation omitted). The exercise of “eternal vigilance” imposes a heavy burden on the owner of a trade secret, as it “calls for constant warnings to all persons to whom the trade secret has become known and obtaining from each an agreement, preferably in writing, acknowledging its secrecy and promising to respect it.”[9] Id. (quotation omitted).
The undisputed evidence in this case demonstrates that Greenfield did not exercise “eternal vigilance” in sharing the details of the “How Sweet the Sound” marketing scheme with others. To the contrary, Greenfield transmitted the “How Sweet the Sound” concept to Erwin-Pen-land, J.A. at 775, and presented the plan to Verizon Wireless in the presence of multiple third parties — including members of “other ad agenc[ies]” — without the benefit of any type of nondisclosure agreement. Id. at 791. The record, without contra *215 diction, also supports the district court’s finding that “[t]he alleged ‘trade secrets’ in question had ... been previously shared with a different third-party, the restaurant chain Captain D’s, with whom Greenfield ... had no confidentiality or other agreement.” Id. at 186.
It would thus be unreasonable, if not impossible, for a finder of fact to conclude that Greenfield took “efforts that [were] reasonable under the circumstances to maintain [the] secrecy” of his marketing strategy. S.C.Code Ann. § 39-8-20(5)(a)(ii). And such efforts are mandatory under the plain language of the Act if a trade secret is to merit its protection. See id.; Lowndes Prods., 191 S.E.2d at 765 (“[A]ll trade secrets are not entitled to ... protection.... ”); 20 S.C. Jur. Intellectual Prop. § 76 (2011) (“A third party who receives information without any express or implied assurance of confidence may do what it likes with the information.”).
Although Greenfield unilaterally placed confidentiality notices on some of his materials, these notations are not sufficient to create a genuine issue of material fact as to the reasonableness of his conduct.[10] South Carolina courts do, of course, require such “warnings to all persons to whom the trade secret has become known.” Lowndes Prods., 191 S.E.2d at 766 (quotation omitted). But South Carolina law is clear that warnings alone are insufficient to place a trade secret within the sphere of protection provided by the Act. See id. (characterizing “isolated steps ... taken to implement secrecy” as insufficient to merit trade secret protection).
A trade secret owner who knowingly discloses proprietary information to others should also “obtain[ ] from each an agreement ... acknowledging its secrecy and promising to respect it.”[11] Id. (quotation omitted). Greenfield points to nothing in the record suggesting he obtained, or attempted to obtain, a confidentiality agreement from the multiple entities to whom he presented the “How Sweet the Sound” concept.[12] Accordingly, the district court correctly determined no material facts were in dispute and correctly held that (1) Greenfield failed to take reasonable efforts to maintain the secrecy of his marketing plan, see 20 S.C. Jur. Intellectual Prop. § 76 (2011) (“If no understanding of confidentiality exists, there can be no secrecy regarding information disclosed.”), and (2) *216 this failure precluded Greenfield from relying on the protection of intellectual property afforded by the Act. See id. § 73 (“South Carolina’s statutory definition of a trade secret requires that the secret be ‘the subject of efforts that are reasonable under the circumstances to maintain its secrecy.’ ” (quoting S.C.Code Ann. § 39-8-20(5)(a)(ii))).
B. Contract
A contract, under South Carolina case law, is defined as
an obligation which arises from actual agreement of the parties manifested by words, oral or written, or by conduct. If agreement is manifested by words, the contract is said to be express. If it is manifested by conduct, it is said to be implied. In either case the parties must manifest a mutual intent to be bound. Without the actual agreement of the parties, there is no contract.
Stanley Smith & Sons v. Limestone Coll., 283 S.C. 430, 322 S.E.2d 474, 477 (S.C.Ct. App.1984) (internal citations omitted).
“The essentials of a contract [thus] include an offer and acceptance.” Benya v. Gamble, 282 S.C. 624, 321 S.E.2d 57, 60 (S.C.Ct.App.1984); see also Hodge v. Nat’l Fid. Ins. Co., 221 S.C. 33, 68 S.E.2d 636, 639 (1952) (“Regardless of which party makes the offer or proposal, its acceptance by the other is necessary to the creation of the contract.”). In this case, Greenfield points to four pieces of evidence, which he believes demonstrate the formulation of a binding agreement with Erwin-Penland.
First, Greenfield cites a March 28, 2006 email that demonstrates the parties discussed forming an LLC with Verizon Wireless if it agreed to fund the “How Sweet the Sound” project, 50% of which would be owned by Verizon Wireless and 50% of which would be owned by 1st Approach and Erwin-Penland. Second, Greenfield relies on two slides from the April 26, 2006 presentation to Verizon Wireless indicating the “How Sweet the Sound” concept was created jointly by 1st Approach and Erwin-Penland and that they offered Verizon Wireless 40% of net revenues if it would agree to fund the project. Third, Greenfield generally points to evidence that he was responsible for creating at least 50% of the “How Sweet the Sound” marketing scheme. Fourth, Greenfield references his work scaling back the “How Sweet the Sound” proposal to address Verizon Wireless’ budgetary concerns, resulting in a new plan similar to that which Verizon Wireless and Erwin-Penland later implemented without his assistance.
Greenfield’s first two pieces of evidence do indicate that he and Erwin-Pen-land reached an agreement concerning the concept they would initially pitch to Verizon Wireless. What is lacking from the record, however, is any evidence demonstrating that Verizon Wireless ever accepted their proposed terms. And it is clear that Verizon Wireless’ acceptance of the offer was a condition precedent to the formation of the LLC which Greenfield and Erwin-Penland had discussed.[13] See Rickborn v. Liberty Life Ins. Co., 321 S.C. 291, 468 S.E.2d 292, 300 (1996) (“A meeting of minds is based upon the intent and purposes as shown by all the circumstances.”). Because the necessary condition precedent of acceptance was never satisfied, no reasonable finder of fact would conclude the parties reached a binding agreement. See McGill v. Moore, 381 *217 S.C. 179, 672 S.E.2d 571, 575 (2009) (“If a contract contains a condition precedent, that condition must either occur or it must be excused before a party’s duty to perform arises.”); Allstate Ins. Co. v. Estate of Hancock, 345 S.C. 81, 545 S.E.2d 845, 847 (S.C.Ct.App.2001) (“[N]o contract arises until the offer is accepted and all conditions precedent are met.”).
Greenfield’s other evidence, which indicates he was responsible for developing portions of the “How Sweet the Sound” project later implemented by Verizon Wireless and Erwin-Penland, is insufficient to change our analysis. The relevant question on Greenfield’s contract claim is not whether Erwin-Penland and Greenfield collaborated in formulating the “How Sweet the Sound” proposal submitted to Verizon Wireless — record evidence makes clear they did. Rather, it is whether Greenfield and Erwin-Penland ever reached a binding agreement concerning the implementation of that scheme. On this record, the district court did not err in concluding there is insufficient evidence for a reasonable finder of fact to conclude that an agreement as to the “How Sweet the Sound” plan’s execution was ever reached.
C. Unjust Enrichment
Under South Carolina law, “quantum meruit, quasi-contract, and implied by law contract are equivalent terms for an equitable remedy.” Myrtle Beach Hosp., Inc. v. City of Myrtle Beach, 341 S.C. 1, 532 S.E.2d 868, 872 (2000). Obtaining this remedy requires Greenfield to show (1) he conferred a benefit upon Erwin-Penland and the third-party defendants, (2) they realized some value from the benefit, and (3) it would be inequitable for Erwin-Pen-land and the third-party defendants to retain the benefit without paying Greenfield its value. See Gignilliat v. Gignilliat, Savitz & Bettis, L.L.P., 385 S.C. 452, 684 S.E.2d 756, 764 (2009); Sauner v. Pub. Serv. Auth. of S.C., 354 S.C. 397, 581 S.E.2d 161, 167 (2003).
The list of benefits Greenfield alleges he conferred on Erwin-Penland and the third-party defendants includes (1) trademark rights, (2) an Effie Award,[14] (3) the BET television special, (4) various financial benefits resulting from the “How Sweet the Sound” series, and (5) intellectual property related to the competitions. As explained below, Greenfield possessed no trademark related to the “How Sweet the Sound” concept; he was therefore unable to confer such a benefit on Erwin-Penland and the third-party defendants. See infra Part IV.D. We further conclude that Greenfield cannot equitably take credit for “conferring” critical and financial success on the “How Sweet the Sound” project when he played no role in the execution and production of the work.[15]
That leaves Greenfield’s argument that he contributed valuable intellectual property to the project in conceptualizing *218 the general marketing scheme Erwin-Pen-land and Verizon Wireless later utilized. Given the fact that (1) Greenfield’s only-claim to a protected intellectual property right arises under the Act, and (2) we have already concluded the “How Sweet the Sound” concept fails to meet the Act’s definition of a “trade secret,” see supra Part IV.A, Greenfield is unable to show that he conferred any intellectual property benefit on Erwin-Penland and the third-party defendants. See Sauner, 581 S.E.2d at 167 (requiring a plaintiff “confer[ ] a non-gratuitous benefit on the defendant”).
We consequently agree with the district court that Greenfield failed to demonstrate he conferred a benefit upon the defendants that would be inequitable for them to keep without paying its value. Summary judgment in favor of the defendants on Greenfield’s unjust-enrichment claim is therefore appropriate. See Othentec Ltd. v. Phelan, 526 F.3d 135, 140 (4th Cir.2008) (requiring “a nonmoving party” on summary judgment “produce some evidence (more than a ‘scintilla’) upon which a jury could properly proceed to find a verdict for the party ... upon whom the onus of proof is imposed” (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986))).
D. Trademark Cancellation
Greenfield also contends the district court erred in refusing to cancel ErwinPenland’s “How Sweet the Sound” mark. See 15 U.S.C. § 1064(3). This argument is based on Greenfield’s contention that Erwin-Penland fraudulently failed to reveal in trademark registration paperwork, filed with the United States Patent and Trademark Office, that he too had “a credible right to use the mark.” Opening Br. at 41. We find no merit to Greenfield’s trademark-cancellation claim.
As this Court has previously explained, “[tjhere is no such thing as property in a trade-mark except as a right appurtenant to an established business or trade in connection with which the mark is employed____ [T]he right to a particular mark grows out of its use, not its mere adoption.” Int’l Bancorp, LLC v. Societe des Bains de Mer et du Cercle des Etrangers a Monaco, 329 F.3d 359, 364 (4th Cir.2003) (quoting United Drug Co. v. Theodore Rectanus, Co., 248 U.S. 90, 97, 39 S.Ct. 48, 63 L.Ed. 141 (1918)) (emphasis added); see also Sengoku Works Ltd. v. RMC Int’l, Ltd., 96 F.3d 1217, 1219 (9th Cir.1996) (“To acquire ownership of a trademark it is not enough to have invented the mark first or even to have registered it first; the party claiming ownership must have been the first to actually use the mark in the sale of goods or services.”) (emphasis added).
Nothing in Greenfield’s Opening Brief, or the record, suggests he ever used the “How Sweet the Sound” mark in commerce.[16] See Opening Br. at 42-42. Therefore, Greenfield failed to establish the necessary factual predicate for his trademark-cancellation claim. See Gen. Healthcare Ltd. v. Qashat, 364 F.3d 332, 335 (1st Cir.2004) (“Trademark rights may arise under either the Lanham Act or under common law, but in either circumstance, the right is conditioned upon use in commerce.”) (emphasis added). We accordingly uphold the district court’s grant of summary judgment in favor of Erwin-Penland. See Celotex Corp., 477 U.S. at 323, 106 S.Ct. 2548 (“[A] complete failure *219 of proof concerning an essential element of the nonmoving party’s case necessarily renders all other facts immaterial.”).
V.
For all of the foregoing reasons, we affirm the judgment of the district court.

AFFIRMED.

. We refer to Verizon Wireless and Joseph Erwin collectively as the "third-party defendants.”

. Our summary of the district court's summary judgment orders focuses solely on the portions relevant to the four issues Greenfield raises on appeal.

. Greenfield raised various fiduciary-duty claims in his Opening Brief but informed the Court at oral argument he no longer asserted those issues on appeal. As Greenfield has now conceded there was no error as to those claims, we do not address them here.

. The Act defines a " ‘[tjrade secret' " as
information including but not limited to, a formula, pattern, compilation, program, device, method, technique, product, system, or process, design, prototype, procedure, or code that:
(i) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by the public or any other person who can obtain economic value from its disclosure or use, and
(ii) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.
S.C.Code Ann. § 39-8-20(5)(a) (emphasis added).

. See also Restatement (Third) of Unfair Competition § 39 (1995) (defining a "trade secret" as "any information that can be used in the operation of a business or other enterprise and that is sufficiently valuable and secret to afford an actual or potential economic advantage over others”); Restatement (First) of Torts § 757 cmt. b (1939) ("The subject mat *214 ter of a trade secret must be secret. Matters of public knowledge or of general knowledge in an industry cannot be appropriated by one as his secret.”).

. See S.C.Code Ann. § 39-8-20(5)(b) ("A trade secret may consist of a simple fact, item, or procedure, or a series or sequence of items or procedures which, although individually could be perceived as relatively minor or simple, collectively can make a substantial difference in the efficiency of a process or the production of a product, or may be the basis of a marketing or commercial strategy. The collective effect of the items and procedures must be considered in any analysis of whether a trade secret exists and not the general knowledge of each individual item or procedure.”).

. See also 20 S.C. Jur. Intellectual Prop. § 75 (2011) (engaging in an extensive discussion of the reasonable-efforts-to-maintain-secrecy requirement based on Lowndes Products).

. Although the dissent is correct that "[d]is-closure ... does not necessarily vitiate secrecy,” Dis. Op. at 28, it fails to account for South Carolina case law conditioning further trade secret protection on the exercise of "eternal vigilance.” Lowndes Prods., 191 S.E.2d at 766.

. See also 20 S.C. Jur. Intellectual Prop. § 75 (2011) ("‘[E]ternal vigilance’ in the form of 'constant warnings to all persons to whom the trade secret has become known and obtaining from each an agreement, preferably in writing, acknowledging its secrecy and promising to respect it' is required.” (quoting Lowndes Prods., 191 S.E.2d at 761)).

. In his Opening Brief, Greenfield also notes that he registered the “How Sweet the Sound” concept as a "Gospel Music Contest" with the Writers' Guild of America, listing himself and Joseph Erwin as co-owners. See Opening Br. at 18. Greenfield does not contend, however, that this registration constituted reasonable measures to maintain the secrecy of the "How Sweet the Sound” marketing plan.

. We respect the dissent’s viewpoint but are compelled to adhere to the principle that "federal courts sitting in diversity must apply state substantive law, decisional as well as statutory, in the adjudication of state-created rights.” Hottle v. Beech Aircraft Corp., 47 F.3d 106, 109 (4th Cir.1995). While obtaining a non-disclosure agreement is not a mandatory requirement under South Carolina law, we emphasize that Greenfield’s failure to even attempt to obtain any such agreements from any of the parties to whom he disclosed his trade secrets bears substantial weight under the precedent of South Carolina’s highest court. See Liberty Mut. Ins. Co. v. Triangle Indus., Inc., 957 F.2d 1153, 1156 (4th Cir. 1992) (“[A] federal court sitting in diversity has a duty to apply the operative state law as would the highest court of the state in which the suit was brought.”).

.See Estate of Kimmell, 993 F.2d at 412 (acknowledging that "the non-moving party may not rest on its pleadings, but must come forward with specific facts showing that evidence exists to support its claims and that there is a genuine issue for trial”) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

. See Alexander's Land Co. v. M & M & K Corp., 390 S.C. 582, 703 S.E.2d 207, 214 (2010) ("A condition precedent is an act which must occur before performance by the other party is due.” (quotation omitted)).

. In 1968, the American Marketing Association established an annual awards program known as the "Effie Awards” to recognize the most effective advertising efforts in the United States.

. The district court correctly found that
[b]y his own admission, Greenfield has not expended ‘any time or effort having the concerts go forward,’ had no involvement in the ‘day-to-day’ operations of the concerts, has not worked on any concert logistics, has not lined up any churches, booked any venues, and has not traveled for the project. By contrast, Erwin-Penland, which has worked on the [’’How Sweet the Sound”] project [from] 2007 through the present, has been compensated for the actual work it performed on the ... project. Such compensation for work performed does not constitute unjust enrichment.
J.A. at 200.

. We decline to address the additional arguments raised in Greenfield’s Reply Brief, as "arguments not specifically raised and addressed in opening brief, but raised for the first time in reply, are deemed waived.” Moseley v. Branker, 550 F.3d 312, 325 n. 7 (4th Cir.2008).